IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF NORTH CAROLINA
STATESVILLE DIVISION
5:99CV178-MU-02

JOHN FRANK BOWEN,           )
    Petitioner,          )
                  )
     v.                )                    **ORDER**
                  )
CARLA O'KONEK, Supt.,       )
_____)

**THIS MATTER** comes before the Court on the petitioner's Motion for Recusal, filed September 2, 2004(document # 64); on his amended Petition for a Writ of <u>Habeas Corpus</u> under 28 U.S.C. §2254, filed November 18, 1999 and January 3, 2000 (document ## 1 and 3); on the respondent's Motion for Summary Judgment and supporting Memorandum, filed April 4, 2000 (document ## 19 and 20); on the petitioner's Response to the respondent's Motion for Summary Judgment, filed May 25, 2000 (document # 24); and on his Motion to Vacate Order . . . And Remove Judge Mullen . . . " (document # 63), filed September 2, 2004.

## I.   <u>FACTUAL AND PROCEDURAL BACKGROUND</u>

Due in no small part to the petitioner's propensity for filing bizarre and baseless Motions and pleadings, and to seek reconsideration of those matters when they inevitably are proven unsuccessful, the State court record of the underlying

1

proceedings is voluminous and convoluted.  However, the pertinent

facts as gleaned from this Court's review of the State record

reflect that in February 1974, Dr. George R. Rosenbaum and his

wife, Diana Rosenbaum, went to their attorney (John Lafferty)

and executed mutual Wills which Lafferty had prepared for them.

The terms of those Wills required that all property be placed in

a trust which was to be created for the benefit of such surviving

spouse and the couple's children.

In about October 1979, the petitioner was introduced to the

doctor and his wife by Richard Wagner.  Wagner knew the doctor

from Wagner's having done some construction work at the doctor's

medical clinic.  The petitioner, Wagner, and the petitioner's co-

defendant, Randal Wiggins, all were well acquainted with one

another.  Wagner is the nephew (by marriage) of Wiggins.

Wiggins knew the petitioner because he was married to the sister

of the petitioner's former wife.

In any event, after having met the doctor, the petitioner

did not remain in contact with him.  Rather, the petitioner's

next contact with the doctor was about three years later in 1982,

when the doctor performed a minor procedure on the petitioner's

son.  The petitioner was not a business acquaintance of the

doctor's, but was acquainted with him from having occasionally

seen the doctor at a local drinking establishment.

On April 1, 1985, Dr. Rosenbaum was fatally injured in a

motor vehicle accident.  Shortly after the doctor's death, the petitioner went to Mrs. Rosenbaum at her home and gave his condolences.  The petitioner did <u>not</u> mention the doctor's Will, a codicil, or any other legal matters on that occasion.

About two weeks later, the petitioner went back to Mrs. Rosenbaum's home and asked if she had probated the doctor's Will. When Mrs. Rosenbaum explained that she knew nothing about handling such legal matters, the petitioner said that he should have started on it, and that he would help her with those matters. Mrs. Rosenbaum did not consider the purpose of the petitioner's offer, but was simply grateful for the help.

Instead, the petitioner gave Mrs. Rosenbaum a list of documents to obtain.  Such list included doctor Rosenbaum's Will and copies of various deeds of trust for properties which the Rosenbaums had owned.  The petitioner told Mrs. Rosenbaum that he would have his daughter, Arvilla "Maria Bowen" Millican, accompany her while she picked up the listed documents.  Still, on that occasion the petitioner made no mention of any codicil. Shortly after that visit, Mrs. Rosenbaum went out with the petitioner's daughter and obtained most of the requested documents.

Subsequently, the petitioner accompanied Mrs. Rosenbaum to Mr. Lafferty's office to retrieve the doctor's Will.  After getting her husband's Will, Mrs. Rosenbaum reviewed that

document, and was reminded that her husband had named a local bank as Executor and Trustee for the realty and Estate assets. Mrs. Rosenbaum also observed that her husband had signed his Will as "George Robert Rosenbaum," that is, he had used his full, legal name for that document. Critically, Mrs. Rosenbaum also observed that the Will did not have any attachments to it. Despite his opportunity to do so, the petitioner still did not mention a codicil to Mrs. Rosenbaum, or to Mr. Lafferty. As with the other requested documents, Mrs. Rosenbaum turned over the Will to the petitioner at that time.

A few days later, the petitioner scheduled an appointment for Mrs. Rosenbaum with another attorney. During their ride to such other attorney's office, the petitioner told Mrs. Rosenbaum of a codicil which the doctor reportedly had executed. Such codicil was signed in the name of "G.R. Rosenbaum." When Mrs. Rosenbaum asked the petitioner about the significance of the purported codicil, he advised that the document named him as a substitute Executor and Trustee for the Rosenbaum Estate and Trust.

The subject codicil reportedly was executed by the doctor on March 16, 1985 in Marshville, North Carolina. That document identifies the petitioner, his daughter Maria Bowen, and Robert Schenk (another acquaintance and/or relative of the petitioner's) as witnesses to the doctor's signature.

4

Ultimately, the doctor's Will was placed into probate in Lincoln County. The petitioner requested and obtained letters naming him as the Executor and Trustee from the Clerk of Court. Following his appointment, the petitioner quickly set up at least two Estate bank accounts, and proceeded to take control over tens of thousands of dollars in insurance proceeds and other funds, which assets legally belonged either to the Rosenbaum Estate or the Rosenbaum Trust.

Then, soon after setting up the bank accounts, the petitioner began writing numerous checks which he mostly made payable to himself, to his family members, and to other persons to whom he was connected. Ultimately, it was determined that those checks totaled over $65,000.00.

Concerning Estate realty, prior to his death the doctor and his wife owned at least three pieces of property. They owned a home in which they were living near Lake Norman. However, through various transactions which either were misrepresented or not made clear to Mrs. Rosenbaum, that home eventually was conveyed to a company owned by the petitioner's daughter Maria Bowen. Not surprisingly, however, Mrs. Rosenbaum did not receive any proceeds from that sale, nor was the property ever returned to her.

The Rosenbaums also had owned a property which housed the doctor's medical practice. However, one month after the doctor's

death, co-defendant Wiggins recorded a deed of trust by which the doctor purportedly had assigned him a $33,000 interest in that property. Such assignment reportedly was made to secure a debt which Wiggins claimed the doctor owed for construction work that Wiggins had performed at some prior point.

A review of the assignment document reflects that it supposedly was made one month before the doctor's death. Notwithstanding Wiggins' claim, Mrs. Rosenbaum testified that, as with the codicil, she was not aware either of any work which Wiggins had performed for her late husband, or of the purported assignment to Wiggins.

In any case, several months after Wiggins recorded that assignment and had named a Trustee--which Trustee had previously lived with the petitioner's daughter Maria Bowen, Wiggins foreclosed on the property. By virtue of that foreclosure proceeding, a sale was conducted at which time Wiggins purchased the property for himself. The petitioner attended that sale, but had already told the Trustee that Wiggins would be the successful bidder.

Court documents showed that following the sale, the subject property was transferred to Wiggins and his wife, and then on to Wiggins' company. Eventually, the medical property reportedly was transferred back to the Trust for a price of $36,000. Although the petitioner claimed that the property was sold back to

the Trust, and cancelled checks show that Wiggins received the $36,000 (in four installments), the property did not remain in the Trust. Instead, Court records establish that the Trust essentially gave the medical property to a company owned by Maria Bowen, since no revenue stamps were placed on the deed of conveyance and no sale proceeds were deposited into the Trust account. Not surprisingly, the property was never returned to either Mrs. Rosenbaum, to the Trust or the Estate.

In addition to the foregoing, Mrs. Rosenbaum testified that the third piece of property was a residence in Lincolnton which she and the doctor had owned before his death. Mrs. Rosenbaum explained that once the petitioner's daughter obtained her Lake Norman home, she moved her family back to the Lincolnton property.

Mrs. Rosenbaum also testified that other than about $60,000, which she received on insurance policies--which funds did not pass through the estate or Trust accounts--she did not receive any cash from her husband's Estate. Mrs. Rosenbaum stated that she and her children merely received a <u>total</u> of about $15,000 worth of personal property to divide among themselves. To add insult to injury, Mrs. Rosenbaum explained that such property included the wrecked vehicle in which her husband had died.

As will be set forth in greater detail hereafter, in or about 1987 the Clerk of Court who presided over the Estate became

concerned about numerous matters which the petitioner reported in his accountings. Thus, the Clerk conferred with the District Attorney of Lincoln County about those matters, and that Office began an investigation. After a lengthy investigation by special agents with the State Bureau of Investigation, on April 20, 1992, the petitioner and several of his co-conspirators were indicted on numerous charges relating to their involvement with the Rosenbaum Trust and Estate.

The petitioner's charges included one count of conspiracy (with Wiggins, Maria Bowen, Richard Wagner, Robert Schenk and others) to obtain property by false pretenses (case 92 CRS 956); ten counts of embezzlement involving the thousands of dollars in checks which the petitioner wrote to himself and his co-conspirators (cases 92 CRS 957 through 965 and 992); one count each of conspiracy to commit forgery of a codicil and forgery of that document (case 92 CRS 993); and three counts of obtaining property by false pretenses relating to three of the four $9,000 payments which the petitioner made to Wiggins supposedly for the re-purchase of the medical property (cases 92 CRS 1010, 1011 and 1059). The trial of those matters began on January 6, 1997.

In addition to the above-noted testimonial evidence, the State also tendered expert testimony from an SBI document examiner reflecting that the petitioner and his cohorts had accomplished the codicil forgery by having photocopied the

doctor's signature onto the paper, then tracing over it with a felt tip pen.  After that, the information naming the petitioner as substitute Trustee and Executor likely was typed onto the forged document.  Attorney Lafferty testified that he had not prepared the subject codicil and, in fact, was not even aware of the existence of that document.

The Clerk of Court also testified that although the petitioner submitted several accountings for the Estate neither ever was approved because each had numerous discrepancies.  For instance, the petitioner's accountings showed that he paid himself more than $10,000 in Executor's fees, without permission; and that such fees were in excess of the statutorily approved amount.  The accountings also showed that the petitioner had transferred to his brother in Florida, Harry W. Bowen, a coin collection valued at $6,700.

Not surprisingly, none of the amounts which the petitioner paid to himself, his family or friends could be verified with invoices showing that such payments were actually owed to those people.  Nevertheless, when the petitioner was unable have his accountings approved, he unsuccessfully sued the Clerk in this federal Court.

At the conclusion of the trial, the jury was persuaded by the State's evidence, and so voted to convict the petitioner on all of the identified charges.  After the jury's verdicts were

published, co-defendant Wiggins asked for leniency, and noted that he was "sorry" for his conduct and that he "really hate[d that] this happened.  Wiggins also said that he was willing to return/cancel the deed of trust for the medical property in order to facilitate its return to Mrs. Rosenbaum.

Interestingly--and certainly in stark contrast to his current contentions--the petitioner advised that he "accept[ed] the jury's verdict[s]." The petitioner also "request[ed] that [he] get what [his] attorney asked for"--an incredibly lenient sentence.  The petitioner stated that in return for lenience, he would "try and pay it all back."  However, the trial Court was not persuaded by the petitioner's belated expressions of remorse.

On the contrary, after finding that at least $111,800 in losses had been inflicted upon the Rosenbaum Estate and/or Trust, the Court also found, as aggravating factors, that the petitioner had induced others to participate in his scheme, and that he had occupied a position of leadership over others in the commission of his schemes.  The Court next found that the petitioner's record included no more than a prior DWI conviction; thus, it properly concluded that the aggravating factors outweighed that sole mitigating factor.

Accordingly, the Court sentenced the petitioner to aggra-vated terms of imprisonment totaling 71 years of confinement, along with multiple years in suspended sentences and years of

probation.  The Court also entered an Order removing the peti-
tioner as the Executor and Trustee for the Rosenbaum Estate.

The petitioner appealed his convictions and sentences to the
North Carolina Court of Appeals.  On appeal, the petitioner
raised some 12 claims for relief.  Upon its review, the appellate
Court specifically identified, addressed and denied four of those
claims--that the trial court had erred by denying his motion to
dismiss for the State's alleged discovery violations requests, by
denying his motion to dismiss on speedy trial grounds, by
allowing the State to amend three of the Indictments, and by
denying his motion to dismiss for insufficient evidence.  See
North Carolina v. Bowen, No. COA97-1273, slip. op at 2-7 (N.C.
App. Aug. 4, 1998).  In addition, the State Court of Appeals
summarily denied the petitioner's eight remaining claims.[1]

However, on March 3, 1997, while his appeal still was
pending, the petitioner also filed a Motion for Appropriate
Relief in the State Court of Appeals.  However, that MAR was
summarily dismissed by the Court on March 5, 1997.  Undaunted by

---

[1]The other claims addressed, but rejected, by the State appellate Court
were: (1) the trial Court erred in allowing the State to proceed on
Indictments which lacked all essential elements in violation of N.C.G.S. §15A-
924(a)(5); (2)the trial Court erred in initiating ex-parte communications with
a witness in violation of State judicial code; (3) the trial Court erred in
expressing an opinion concerning the credibility of witness' testimony; (4)
the trial Court erred in permitting the admission of new evidence after having
prompted the witness to give such supporting testimony; (5) the trial Court
erred in expressing and opinion concerning the petitioner's credibility; (6)
the trial court violated the State's best evidence rule; (7) the trial Court
erred in permitting the State to lead certain witnesses; and (8)the trial
court gave erroneous jury instructions for certain charges due to a fatal
variance.

his lack of success, the petitioner then filed a series of extraneous, pro-se motions with the State Court of Appeals though his appeal still had not been decided.  However, those Motions also were dismissed by the Court.

Then, following the State Court of Appeals' decision on his appeal, the petitioner filed an "Appeal" in the State Supreme Court.  Also at that time, the petitioner filed a Petition for Discretionary Review, a Petition for a Writ of Certiorari, and Motions for a New Trial.  However, by a single Order filed by the Supreme Court on December 30, 1998, that Court summarily denied all of those filings.  Then, by an Order filed May 10, 1999, the petitioner's so-called Petition for Rehearing also was denied by the State Supreme Court.

Thereafter, on November 18, 1999, the petitioner filed the instant federal _Habeas_ Petition under 28 U.S.C. §2254, raising thirty-four claims, exclusive of sub-parts, for review.  Careful review of the petitioner's voluminous pleadings tends to reveal that he essentially has taken the claims which he raised in his direct appeal and attempted to recast them in a federal Constitutional hue.

Nevertheless, after carefully reviewing all of the pertinent documents in this case, the undersigned finds that the petitioner has failed to demonstrate any entitlement to relief on his Motion.  Accordingly, the petitioner's _Habeas_ Petition will be

<u>denied</u> and <u>dismissed</u>.

## II.  <u>ANALYSIS</u>

### A.  <u>Standard of review for habeas petitions</u>.

Generally speaking, the standard of review to be applied by the Court to <u>habeas</u> cases is "quite deferential to the rulings of the state court."  <u>Burch v. Corcoran</u>, 273 F.3d 577, 583 (4th Cir. 2001).  Indeed, as the <u>Burch</u> Court noted:

> [p]ursuant to the standards promulgated in 28 U.S.C. §2254, a federal court may not grant a writ of habeas corpus with respect to a claim adjudicated on the merits in state court proceedings unless the state court's adjudication: (1) "resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States" . . . ; or (2) "resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding. . . ."

<u>Id</u>. (internal citations omitted).

The Supreme Court has explained that a State court adjudication is "contrary" to clearly established federal law, only if "the state court arrives at a conclusion opposite to that reached by [the Supreme] Court on a question of law or if the state court decides a case differently than [the Supreme] Court has on a set of materially indistinguishable facts."  <u>Williams v. Taylor</u>, 529 U.S. 362, 413 (2000), quoted in <u>Burch</u>.  An unreasonable application is different from an incorrect application of federal law, the former being the requisite showing.  Therefore, this Court

may <u>not</u> issue the writ even if it concludes in its own independent review, that the relevant state court merely made an incorrect or erroneous application of the correct federal principles. <u>Id</u>.

Finally, the applicable standard of review is to be applied to "all claims 'adjudicated on the merits,' that is, those claims substantively reviewed and finally determined as evidenced by the state court's issuance of a formal judgment or decree." <u>Thomas v. Davis</u>, 192 F.23d 445, 455 (4th Cir. 1999).

**B.    <u>The undersigned finds that the State appellate Court's denial of the petitioner's claims is entitled to deference from this Court</u>.**

Turning first to the petitioner's discovery related claims, here the petitioner argues that the trial court violated his due process rights in denying his Motion to Dismiss for the State's alleged failure to comply with his discovery requests (current claims ## 7 and 10). That is, the petitioner asserts that the State never provided him with all of the documents from the Rosenbaum Estate file, and that such failure to comply prejudiced his right to a fair trial because it "den[ied] him access to potentially exculpatory evidence." Notably, however, the petitioner has never precisely identified any document or specific information which he believes was withheld from him.

Rather, when the petitioner raised the State law version of this claim on appeal, he merely argued that the State's alleged

discovery violation had caused him "unnecessary delay in the preparation of his defense."  In its opinion, the State Court of Appeals concluded that the decision whether or not to impose sanctions for discovery violations remained within the discretion of the trial Court; and that since the petitioner had failed to demonstrate that the State's conduct had actually prejudiced him, the trial Court's denial of his Motion to Dismiss was not an abuse of that discretion.

In Brady v. Maryland, 373 U.S. 83, 87 (1963), the U.S. Supreme Court held that suppression by the prosecution of evidence favorable to an accused upon request violates due process if, and only if, such evidence is material either to guilt or punishment.  See also United States v. Bagley, 473 U.S. 667 (1985) (noting that to prevail on claim of reversible discovery error, defendant must allege facts which show a reasonable probability that result of proceeding would have been different had evidence been disclosed to defense).

In the instant Petition, the petitioner has failed even to identify what information he believes was withheld, let alone his failure to establish that such information was material to his guilt or punishment.  Moreover, the record reflects that shortly before the petitioner's trial commenced, the State did provide the petitioner's attorney access to the subject file, and did allow her to make copies of any documents she desired to have.

Therefore, the undersigned finds that the trial Court's denial of the petitioner's Motion to Dismiss for purported discovery violations was entirely reasonable on these facts.

Similarly, the petitioner alleges that the trial Court violated his rights by denying his Motion to Dismiss for the State's alleged speedy trial violations (current claims ## 4 and 5). Once again, however, the record is less than supportive of the petitioner's claim. In summary, that record reflects, as the State appellate court found, that many of the delays in the commencement of the petitioner's trial were occasioned by his own conduct.

That is, the record shows that about five months after the petitioner was indicted on the subject charges, the petitioner came to this Court with a document captioned as a "Petition For Removal Of State Court Criminal Cases To The United States District Court . . . ." That Petition sought the dismissal of the petitioner's State criminal charges on his nonsensical theory that such charges were filed in retaliation for his opposition to the gubernatorial candidacy of the Honorable Lacy H. Thornburg, who then was North Carolina's Attorney General. (See 5:92CV111-MU, filed Sept. 18, 1992). However, after considering the State's Motion for Remand, by Order filed December 10, 1992, this Court denied the Petition for Removal and remanded this matter to State Court. The petitioner appealed this Court's decision,

however, on May 14, 1993, the Fourth Circuit Court of Appeals dismissed the appeal.

In the meantime, in March 1993, the petitioner also filed his first Motion to Continuance his criminal proceedings in State court. Thereafter, between March 1993 and July 1996, the petitioner filed at least five additional Motions to Continue his trial. The State did not oppose the petitioner's motions; therefore, all of those Motions were granted by the trial Court.

The record further shows that during the time that his criminal charges were pending, the petitioner also pursued an interlocutory appeal of the denial of his Motions to Dismiss and for Joinder. The petitioner even erroneously appealed the denial of his Motion to Continue, which Motion had been granted. Not surprisingly, then, on January 4, 1994, the State Court of Appeals dismissed the petitioner's appeal; and the State Supreme Court denied the petitioner's request for review by Order filed April 7, 1994. Significantly, the petitioner's trial was continued while such appeal was pending.

Thereafter, in the early part of 1996 the petitioner returned to this Court on another attempt to challenge his State criminal charges. (See 5:96CV43, filed April 18, 1996). That attempt also was unsuccessful and ended in the remand of the petitioner's case back to the State court.

Consequently, when the petitioner raised his challenge to

the trial Court's denial of his Motion to Dismiss under the State's speedy trial provisions, the State Court of Appeals properly rejected that claim. Indeed, that Court appropriately concluded that the petitioner had failed not only to demonstrate that the delay was occasioned by the State's neglect or willfulness and that he was prejudiced by the delay, and also that he had failed to overcome the evidence which established that the petitioner actually was the cause of most of the delay in his case.

Such determinations are amply supported by the record and fit squarely into the factors set forth in <u>Barker v. Wingo</u>, 407 U.S. 514, 530 (1972)(noting that before dismissing prosecution for Sixth Amendment violation of speedy trial rights, trial court must determine, among other things, whether the government or the defendant is more to blame for that delay and whether the defendant suffered prejudice as the delay's result). Therefore, given the record of this matter, the State Court's decision on this issue may not be disturbed.

Likewise, the petitioner's claim that the trial court erred when it allegedly allowed the State to amend the Indictments (current claims # 18 and 27) also does not entitle him to any relief.

On appeal, the petitioner claimed that the trial Court's decision to allow the State to change three of the Indictments to

reflect that certain deeds had been recorded in book number 641 rather than in book 640, because that change was an impermissible amendment under State law. However, the State appellate Court found that the subject changes were needed merely to correct typographical errors. Thus, that Court concluded that the changes "did not 'substantially alter the charge set forth in the indictment[s]'" so as to violate the petitioner's rights.

Under federal law, it is clear that where, as here, "different evidence is presented at trial but the evidence does not alter the crime charged in the indictment, a mere variance occurs." Id. Most critically, a "mere variance does not violate a defendant's constitutional rights unless it prejudices the defendant either by surprising him at trial and hindering the preparation of his defense, or by exposing him to the danger of a second prosecution for the same offense." Id. (internal quotations and citation omitted).

In the instant case, the correction of the typographical errors in the three Indictments created, at most, a "mere variance." However, on this record the petitioner cannot possibly demonstrate that such variance either surprised him or hampered the preparation of his defense. Indeed, the record reflects that after the State became aware of the errors and the Court granted the prosecutor permission to correct the book numbers, the Court asked defense counsel if she needed additional

19

time to review and prepare her defense of those matters.

Significantly, however, the petitioner's attorney declined the Court's offer, and the petitioner does not now claim that counsel was ineffective for having declined the offer. Therefore, the petitioner is not entitled to any relief on this claim.

The petitioner also cannot prevail on his claim that the trial Court violated his right to due process by denying his motion to dismiss for an insufficiency of the evidence (current claims #12 and 20). In support of this claim, the petitioner argues, in a most conclusory fashion, that the State was not required to prove every essential element of his offenses beyond a reasonable doubt because the Indictments failed to list all such essential elements; and that the Court failed to properly charge the jury on the essential elements of such offenses.

To the extent that such allegations are challenges to both the sufficiency of the Indictments and of the evidence, the petitioner's claims are wholly without merit. Indeed, this Court is aware that post-conviction challenges to the sufficiency of indictment are rarely successful. Midland Asphalt Corp. V. United States, 489 U.S. 794, 802 (1989). When challenged on appeal, "[i]ndictments and informations are construed more liberally . . . and every intendment is then indulged in support of . . . sufficiency." United States v. Sutton, 961 F.2d 476, 479 (4th Cir. 1992). Thus, the Fourth Circuit typically will

uphold an imperfectly drafted charge if it contains "words of similar import." Finn v. United States, 256 F.2d 304, 306 (4th Cir. 1958).

Likewise, the Court is also aware that a "defendant challenging the sufficiency of the evidence to support his conviction bears a heavy burden." United States v. Beidler, 110 F.3d 1064, 1067 (4th Cir. 1997) (internal quotations and citation omitted). On such a review, the relevant question is "whether, after viewing the evidence in the light most favorable to the prosecution, an rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." Jackson v. Virginia, 443 U.S. 307, 319 (1979).

In the instant case, the petitioner's conclusory assertions of a due process violation fall far short of raising a valid challenge to either the sufficiency of his Indictments or the evidence which was presented against him. Thus, these claims are subject to summary dismissal on that basis.

Furthermore, the Court's review of the record shows that the Indictments in question actually tracked the statutory language under State law. Therefore, such Indictments are constitutionally sufficient. See, e.g., Hamling v. United States, 418 U.S. 87, 117 (1974).

Moreover, as to the evidence, this Court's factual recitation demonstrates that the State produced testimony and documen-

tary materials which establish that the petitioner did commit the crimes for which he was convicted.  On the other hand, the petitioner's meager denials and his attempts to explain away that evidence--particularly in the face of his admitted acceptance of the jury's verdicts and his pledge to pay back the losses--show that his convictions were not obtained in violation of the Constitution.

In sum, the State Court's denial of the foregoing claims was reasonable, and those decisions will not be disturbed by this Court.

   **D.   Moreover, this Court also must reject the peti-
         tioner's other claims which were summarily denied
         by the State Court of Appeals**.

The record indicates that in addition to foregoing claims, the petitioner raised eight other claims on appeal, which matters he now is attempting to raise in Constitutional terms by the instant Petition.  However, the State appellate Court found that those matters were devoid of merit so much so that the Court did not even set them out in its appellate opinion.  Rather, that Court summarily rejected those issues in the concluding paragraph of its opinion.

Specifically, the appellate Court summarily denied the peti-
tioner's claims that the trial court committed error: (1) in allowing the trial to proceed despite the failure of the Indict-
tments to state the essential elements and confer jurisdiction

upon the Court (current claim # 2); (2) in initiating ex-parte communications with one of the State's witnesses (current claim # 14); (3) in expressing an opinion concerning the credibility of Mr. Lafferty (current claim # 15); (4) in expressing an opinion as to the petitioner's credibility (current claim # 17); and (5) in allowing the State to pose leading questions to its witnesses (current claim # 19).

As with the first series of claims, however, this Court has determined on the basis of its previously stated reasoning-- chiefly, the petitioner's failure to show that the trial Court's decisions were contrary to federal law, or otherwise unreasonable--that these claims also must be <u>denied</u>.

**E. <u>The petitioner's remaining claims are without merit</u>.**

The petitioner also has raised twenty additional claims concerning matters which reportedly occurred during his trial and his appeal (current claim ## 1, 3, 6, 8, 9, 11, 13, 16, 21, 23, 24, 25, 26, 29 through 34). Those challenges to his State court proceedings, however, as specious.

For example, he accuses the prosecutors who handled his case of having personally given perjured testimony against him. However, the record shows that neither prosecutor ever was sworn as a witness or otherwise allowed to testify in the petitioner's proceedings.

The petitioner also complains about occasions when the trial

Court posed follow-up questions to the State's witnesses, and reportedly permitted perjured testimony to be introduced. However, inasmuch as this Court has not discerned any Constitutional violations on the basis of the Court's follow-up questions, and the fact that differences in testimony as revealed by cross-examination do not amount to instances of perjury, these claims are baseless.

The petitioner complains about his having been joined for trial with his co-defendants. However, under federal law, deendants may be tried together when they are alleged "to have participated in the same act or transaction or in the same series of acts or transactions constituting and offense or offenses." See Fed.R.Crim.P. 8(b). Thus, notwithstanding the dismissal of the charges against two of the individuals, the petitioner cannot establish that his Constitutional rights were violated by his having been tried with the same people with whom he was alleged to have conspired and engaged in acts of fraud and embezzlement.

As for his claim that the trial Court lacked subject matter jurisdiction due to its failure to conduct an hearing on certain of his Motions, such claim clearly is meritless. To put it simply, a court is not divested of its jurisdiction to hear a case by virtue of any outstanding miscellaneous motions, which motions ultimately are denied in any event.

Similarly, the petitioner's challenge to the evidence which

was presented on the grounds that it caused a variance in the charges is foreclosed by this Court's determination that there was no fatal variance in this case.

As to the remaining claims--including the one that the State appellate court found that his trial counsel was constitutionally ineffective, along with his various and sundry other complaints about the trial Court's Judgment and the appellate Court's review of his claims--all of those matters are wholly without merit and must be <u>denied</u>.

**E. <u>The undersigned need not recuse himself</u>.**

Finally, among the multitude of Motions and documents which the petitioner has filed in this case is his Motion seeking the removal of the undersigned from this case. However, under 28 U.S.C. §455(a), recusal is required only when the judges impartiality might reasonably be questioned. Thus, inasmuch as the basis for this Motion is the petitioner's dissatisfaction with the undersigned's decisions on several of his miscellaneous motions, the petitioner's Motion seeking recusal will be <u>denied</u>.

**III. <u>CONCLUSION</u>**

The petitioner has failed to demonstrate an entitlement to relief on any of his 34 claims. Therefore, the instant Petition will be <u>denied</u> and <u>dismissed</u> in its entirety.

25

## IV.  ORDER

**NOW, THEREFORE, IT IS ORDERED THAT:**

1.  The petitioner's Motion to Remove the undersigned is **DENIED;**

2.  That the respondent's Motion for Summary Judgment is **GRANTED;** and

3.  That the petitioner's amended Petition for a Writ of Habeas Corpus is **DENIED** and **DISMISSED.**

**SO ORDERED.**

**Signed: October 14, 2005**

Graham C. Mullen
Chief United States District Judge